Good morning, my name is Kathleen Weck, and I'm here to speak on behalf of Ms. Kathleen Sheppard. I represent Henry Mack. On appeal, Henry Mack is asking your honors to consider two issues that affected the fairness of his trial. First, that the judge erred when she refused to allow in evidence to support Henry Mack's defense. And the second error occurred when the forensic interviewer bolstered D.H.'s credibility by suggesting that D.H.'s behavior was typical of children who have been sexually abused. Regarding the first issue, when the judge found Mr. Mack guilty, she specifically noted that there was no evidence that anyone had an axe to grind. But Mr. Mack wanted to show that someone did have an axe to grind, but the judge had refused to let the defense introduce evidence that Ikena Wilson believed Mr. Mack owed her money and that she had threatened Henry that she knew a way to put him in jail for the rest of his life. Now, it wasn't, and I know your briefs say that she was the first one that heard this information from the child, but that's not true, is it? Well, that's what the trial counsel said, and it is technically correct, as I conceded in the reply, that according to D.H., she mentioned to this other girl named Dasha. But the first adult was Ikena, and Ikena was presumably the one, reportedly the one, that then told D.H., yes, you need to tell your mother and take this further. But this other child that reportedly D.H. first said this had happened to her, she did not testify at the 11510 hearing or at trial, so Ikena is the only adult, is the first adult that she referred to. If she had an axe to grind, then it would be that Ikena went to her and said, hey, isn't it true that he abused you and tried to garner that testimony from the child? There's no evidence that that occurred. Is that correct? Well, the defense theory is that Mack was framed. Henry Mack was framed. I mean, he's saying he didn't do it. He took the stand, tried to testify why it was impossible for it to happen. And it is a curious case in that D.H. waits nine months after Henry has left the house to even make these allegations, which is a long time. That's a curious fact. And we really don't know what went on in this house because I find it very odd that this beanbag chair has the semen of some other individual. So who knows what this child has actually witnessed and gone on in this house? And that came in. That did come in. But the point is, you know, he believes he was framed. There's a reason for it. And so his defense is being that he was framed. He has to show motive why someone would do that. And the theory here is that Ikena was so upset with him, she'd made threats, and so that this evidence needs to come in. By proffering this evidence as motive evidence, showing Ikena had some motive or ax to grind, are you not offering that evidence or were they not offering it as substantive evidence as opposed to impeachment? Well, I mean, the state's whole focus is on the impeachment, and I did discuss a lot about the impeachment in my brief. Not to set that aside, it's important to impeach her credibility, but substantively, he would have a right to even get up there and offer evidence that Ikena had made threats to him or to have this Jason Davis come. This would have been a non-hearsay purpose, not to prove the truth of the matter that she said, you owe me money and I'm going to put you in jail, but to show her motive or bias, her state of mind, what she felt to Henry. So even substantively, he should have been able to present evidence to support his defense. Did he have Jason Davis subpoenaed? No, he didn't. The defense counsel asked for a continuance to do so. It is not clear why defense counsel did not subpoena Jason Davis in the first place, because clearly there is the statement that Jason had made, which had been tendered to the state. From what I can tell from the trial record, the defense counsel subpoenaed Ikena, presuming that she was going to support the defense and admit that she had made these threats. But for whatever reason, he seemed surprised that she, according to him, is lying on the stand. That's a surprise, isn't it? You know, it is kind of curious, why did the state not call Ikena? I mean, if she is the first adult, they bring in the mother, but the state doesn't subpoena Ikena. And it's almost like Ikena is being hid, because her mother, the child's mother, Alyssa, is asked, and she says, you know, during her testimony, which I think was about a week before the defense, because the trial had been continued, said she didn't even know where Ikena was. So Ikena has to be tracked down and brought in. It seems that defense counsel didn't prep her as a witness, and, you know, so, you know, it is clear that, you know, I don't know why he didn't get Jason Davis for the first. And the state doesn't have to call Ikena if there is, in their mind, reliable evidence from the child. In fact, we had that information before the trial court. So it's not necessarily unusual that they wouldn't call her, because all she might be doing is repeating. Wouldn't that be accurate? Possibly. It just seems if Ikena wasn't actually the, that's true, I mean, if Ikena was the first adult that DH made the allegations to, you know, she could have been the one to testify, I suppose, as well as Alyssa Wilson. Maybe the state couldn't find her. I didn't have the record to go back and check, but I believe there was some indication they couldn't find her. But clearly the defense attorney was surprised. And that's why he's asking for a continuance. And since this was a bench trial, it had already been continued once, the point being raised on appeal here, and it was a preserved error in the post-trial motion, is that he should have been allowed to get a continuance to get Jason Davis in. The victim is testifying to a period of time from about 2003, I think, until 2006? Yes. And the issue with, at least as best the evidence relates, the issue with this confrontation didn't occur until significantly after that period of time, didn't it? Yes. The altercation threats evidence is supposedly taking place in November of 2006, which is about two months or so before DH first makes the allegations. And this is still about seven months, perhaps, after Henry Mack has moved out of Alyssa's house. So it is a certain time period. And again, as far as the evidence goes, just to reemphasize that DH waits a long time before these allegations come out, a long time. She's afraid of Henry Mack. He's not even there. She hasn't even seen him since this time period. He's not even there. And then suddenly, in a curious way, this friend's— But he is the father of her brother. Right. And it sounds—I find that—this is getting into speculation, but when I think about it, axes to grind. The father of this brother, he hasn't been seen around the house, according to DH. We don't know if he's even—how Alyssa actually feels about this man who had fathered her child. How is this not collateral? It's not collateral if it's—this is from the impeachment standpoint. It's not collateral if it's going to show motive. This is part of its defense to show that there is a reason why this child could be making up these allegations. That would be the reason why it's not collateral. But, you know, we can look at it from an impeachment standpoint, why it's important to show that—to impeach Aikina's credibility. But from a whole other standpoint, it's going to evidence to show that someone had a motive. It has substantive evidence. And you have two ways that you're trying to do this. One is through Aikina's testimony, and one is through the defendant's testimony, correct? Yes. Yes. Now, with Aikina's testimony, I mean, how does McCarter not apply and knock this testimony out? McCarter was the one where the girl— Well, to be honest, I mean, it has the rule of law that, you know, about a party impeaching its own witness. Oh, if it's affirmatively damaged the case? Right. Right. Well, I think the test of affirmative damage is whether or not they were worse off than if the person never testified in the first place. For her to get up there and say—deny making any threats, that is more damaging than if she had never said that at all, because perhaps Henry could have just said, you know, this Aikina had made threats against me, and then it would just be kind of left—you know, for him to explain what had happened to him, we wouldn't have her denials. It would just be a— Let's assume for a second that is collateral and that is—and the objection is properly sustained under McCarter and the cases that talk about collateral issues. How is the defendant's testimony standing alone, not—even if it is error, harmless error? I mean, how does it rise to the level of beyond harmless error, the defendant simply not being able to testify that this woman threatened me? When thinking of this case, like the U.S. Supreme Court saying in Crane v. Kentucky about an accused has a right to present a defense, present witnesses to establish a defense, and present his version of facts to the jury. Well, that would be presenting, you know, either Jason Davis or himself presenting his version of the facts to the jury. His version of the facts is he was framed, this woman had an ax to grind with him, had a motive to induce this child, and the judge should consider this. You know, it's just his defense. His defense is that he was framed, and he's trying to show some reason why. It's his word against the child's word. And he has to do what he can to make it more likely than not that he was framed. Well, I can't help but wonder that if Jason Davis had actually been subpoenaed and was sitting right there from, you know, in his jumpsuit or wherever he was coming from, if this wouldn't have been different. And isn't it just possible that the court said, look, you know, you had this opportunity, you did not use it properly, and I'm not going to give you a second bite of the apple? Well, that's not what the judge is kind of like a reason why she didn't do it. She's still discussing now about the impeachment on the collateral issue. We don't really know what would have happened if Jason Davis had shown up. And this is really why I didn't frame this as an effective assistance of counsel, because we can't necessarily prove what Jason Davis would have said. All we do know is what defense counsel from the record, his offer of proof, is what he expected Jason Davis to say. And we do have the fact that there was this 15-page statement of Jason Davis's interview with the investigator that was tendered out there. And from what defense counsel's acting is presenting, he's expecting, you know, this evidence to come out. He expected Artina to say something. He presented to expected it, for her to say it. And she didn't, so it kind of like blew up in his face. Well, Artina testified first, right? Before Henry Mapp did. Before the defendant. Yes. And then, of course, before Davis ever would have hit the stand. So the trial judge was looking at this as perfecting that impeachment. Right. You know, if she denied making this statement, then, of course, counsel would be, it would be incumbent upon counsel to perfect that impeachment. I mean, that appears to me to be the way that the trial court looked at that and then looked at it strictly in the line of impeachment and not as another way of putting in substantive evidence. Right. Although defense counsel did say, you know, I believe, I don't know this exact quote about, you know, we want to show that she has a motive or bias. You know, they wanted, that's like substantive evidence to show her motive and bias. But he kind of like caved in to the judge and didn't really fight it and just figured he'd objected and then kept it in the post-trial motion as a preserved error. If your honors, moving on to the second issue. Right. Regarding the second issue, it was improper for the forensic interviewer to testify about how D.H. exhibited characteristics consistent with that of a child who has been sexually abused. The purpose of section 115-7.2 is to admit an expert's testimony that the victim's behavior is consistent with known syndromes. But this is the sort of testimony that Mueller was offering. By the term red flag, Mueller was suggesting that D.H.'s behavior was consistent with that of a typical child who has been abused. But the state had not shown that Mueller was qualified to speak on this topic. And furthermore, it was improper for Mueller to vouch for D.H.'s credibility on the issue of whether D.H. had been abused or not. And this second error also made the... How does, I mean, how does calling something a red flag? I mean, according to the testimony, this, I guess, Terry Mueller, or no, I'm sorry. Tracy. Tracy Mueller has been working at this center. She interviews children through this process of the child advocacy process. And these were things, as I read her testimony, these were things that she had seen in other children who then went on to be found abused. She wasn't testifying that this child was abused. She was testifying that as a result of some of these red flags that, you know, she felt that this was important for notation and for the court to be aware of. But this is the type of CSAAS testimony in which she's... Was that ever mentioned anywhere? It wasn't mentioned. But there's cases that say you don't have to say that's what it is when it's actually, the testimony is fitting into that. No, there's no question. It is the type. But she wasn't saying that this is, this is, in this case, she's saying that I have, this is a red flag I have seen in other cases of children who have been found, either as a matter of law or as a matter of psychology, to be found to be abused. So how is she testifying to this actual syndrome? Because I think that's your problem. You say that she is presenting evidence of this syndrome when she's actually, at least if you, as you read the whole thing, submitting testimony of her experience in this line of work. Well, I would maybe concede that the last point in which she talks about it's typical for children to disclose after they have spoken with somebody else, that might be something that you could see when maybe an observation. But the whole red flag, the way I'm looking at it, is her saying this is typical of someone who's been abused, saying this child exhibits this syndrome, this behavior. That means that she's been abused. Especially when she talks about her calm demeanor, how matter of fact she was. This shows that she was abused. But when you think about that, she's basically vouching for DH's credibility. What would she have done if she had said DH was hysterical? That means she wasn't abused? I mean, no matter what she said, you know, you could probably say this shows she's been abused. And the bottom line is, is it appropriate for her to be bolstering the child's credibility, vouching for the child's credibility by talking about this is typical of a child who's been abused? Well, this sort of comes down to the whole concept of what happens at child advocacy centers. I'm not aware that many of the directors or interviewers at child advocacy centers are actually psychologists or psychiatrists. They are persons who have received certain training and may go on to be a psychiatrist or psychologist. But in large part, they're attorneys who do this type of work, who have taken courses on interviewing children, and who have trained in that regard. But there has never been a challenge that I am aware of to their testimony generally. Well, the challenge here is that she's not an expert to testify about the characteristics of abused children when she's saying that this child's behavior is consistent with someone who's been abused. But isn't she really an expert in, like, forensic interviewing? Yes, well, so yes, she was never actually presented and offered as an expert in that, but they all seem to assume that she's an expert in that field. Well, her testimony with respect to how long she's been working in that area, et cetera. Kind of like a police officer who's investigating interviewing people. It's not for him to say, this person definitely committed the crime because he's exhibiting behaviors of defendants I've seen that ended up being guilty. You know, that's maybe analogous to what's going on in this case. How is this case different from Turner? Turner was... I would say that it is different in Turner. Turner is more similar to the third point that I brought up in this case. Turner, he was talking about it's typical for them to recant. That's based on an observation. He's interviewed a lot of people. They say they initially, they initially, you know, say it and then they recant. That's his observation. It's different than him talking about red flags that indicate to him that they have been abused. That kind of makes sense. It's more like something that's more objective, an observation. At what point did the defense counsel object to this testimony? He did not object to this testimony, and that's why I've raised this either as plain error based on the closely balanced nature of the evidence  particularly the prejudice here is that the judge is relying specifically on Tracy Mueller's testimony about D.H.'s behavior, bolstering D.H.'s testimony that she's been abused. And that would be the prejudice from the prejudice prong for ineffective assistance for not objecting. Any other questions? You have a chance. Thank you. May it please the court. Counsel. It's important to remember that we are, of course, reviewing what the trial court did and how the evidence was advanced by defendant. The standard of review, of course, is abuse of discretion and reversal is not warranted unless the evidence could reasonably have affected the verdict. Do you think the fact that this is a bench trial versus a jury trial is any different here? I think it is, Your Honor, because we look at how the trial court would have considered this evidence. And the trial court here made findings about the testimony that it had already heard from the state. The state had completed its case, of course, when this evidence was attempted to be put in by a defendant. And that evidence showed that, as the trial court found, the victim described details of the abuse, which the trial court found showed a knowledge a child of that young age should not have. The court found the victim described the texture, feel, and taste of defendant ejaculating in her mouth. Her testimony was corroborated by evidence regarding the pornographic tape and the chocolate sauce. The victim consistently described those assaults in consistent detail, including telling her that she did it better than her mother. And also, as Your Honor raised, the charged conduct that the victim described took place between August 1st, 2003 and April 30th, 2006. The conversation which Akina allegedly threatened defendant occurred in October or November of 2006. And when the trial court sustained the state's objections to defendant's testimony about Akina's alleged threats on the ground that it was collateral, defense counsel did not offer any basis for letting it in. It was only after the trial court has sustained the prosecutor's objection to the defendant's motion for continuance to get in Jason Davis' testimony that defense counsel gave the basis that defendant is relying on, on appeal, that because Akina was the first person, and as Your Honors have brought up, she wasn't exactly the first person who talked to the victim, before the victim talked to police, the evidence was relevant to establish any motive Akina may have had to try to influence the victim. Now, of course, there was no evidence that the victim had been induced to make her statements. There was no reasonable probability that the trial court or any fact finder could find that the victim, who was 10 years old when she told Akina about defendant's assaults, and those assaults began when she was 7, could have been induced to make her statements, including the extent and the nature of the details that she described regarding the conduct over a period of years, ending well before Akina made her alleged threat to defendant. Under those circumstances, having heard that evidence, the trial court did not abuse its discretion in finding that the excluded evidence was collateral. Well, what harm would it have been, in light of the fact that it was a bench trial, to give her a continuance to go get some witness? Well, the only basis for letting this evidence in had been, it had been advanced, of course, as impeachment, and if the trial court had found that it was collateral, why go to that trouble? As your Honor's pointed out, the witness could have been subpoenaed, he was not. Again, of course, we're looking at what the trial court did and whether that was an abuse of discretion, not how the evidence could have been brought in. And these circumstances go both to the reasonableness and whether or not the trial court was right in excluding this evidence, and also to harmless error, of course. Is it an abuse of discretion standard on that point, though, on whether a defendant is denied the opportunity to present evidence in support of his theory of the case? Defense counsel, in her brief, argues that's a de novo standard of review. Well, there are other cases that we discuss in our brief, including Bonds, where the defendant made a similar argument and said, you know, and of course any kind of evidence that the defendant attempts to bring in would be in support of his defense, obviously. And so that argument can always be made. However, the courts have found, and it would be true, that these are evidentiary rulings that we're looking at, and that standard is abuse of discretion. So on that issue, we would say that the court was correct in making its rulings, and any possible error would be harmless. Turning to Issue 2, let me ask one more question. Wasn't the defendant, when he did testify, able to express an opinion, as it were, on the truthfulness or the positions of several of the actors here? Didn't he say something about the fact that the victim just plain lied, that Alyssa had left some things out, and Akina was just plain dumb or something like that? There were, yes, Your Honor. There were other ways that this was brought before the trial. In fact, the theory that somehow the victim was lying, that she had been put up to this, I think in closing argument, I think the argument was that somehow Mueller had influenced her. And as the prosecutor pointed out in his closing argument, the details that the victim talked about, she could not have been coached. So the idea, yes, that she was influenced in some way was brought before the trial, in fact. And as to Mueller's testimony, she talked about this victim, not any syndrome. The red flag testimony had to do with, she said that the fact that the victim did not have a name for the female genitalia was kind of a red flag, that she did have a name for the male genitalia raised a red flag that someone told her the name, and that she was calm, matter of fact, and displayed little emotion. It could be just her personality, but it was pretty common. It wasn't a one-time scare to death shock thing. Those were all things that were talking about this victim, not any syndrome, not this is typical of children who have been abused. Well, what does a red flag mean then? I mean, I think that's what the defense is pinning their primary argument on, what is a red flag? Because she did use the terms this was a red flag, this was a red flag. What's she talking about? A red flag where? She's talking about her own experience with other child victims and saying that this is, based on my experience, what this showed that there was something that was wrong. But to put that into this particular syndrome, and the cases do talk about, you can talk about various behavioral characteristics, and that's fine. In fact, I think it was Simpkins, a case that the defendant cited in his reply brief, that said that that was fine. But didn't they say that it was improper in Simpkins for the investigator to testify to that? The court in Simpkins held it was improper on a different ground. The court in Simpkins talked about Section 115-7.2, but the court found that the testimony was improper because the expert talked about things that had nothing to do with the victim in that case and also found that the witness gave improper commentary on the victim's credibility, vouched for the victim's credibility. And that leads me to, the defendant in his reply brief in an oral argument talked about this was wrong because Mueller's testimony somehow vouched for the victim's credibility. That's not an argument that was raised in the initial brief. The initial brief was a very narrow issue, whether this fell within Section 115-7.2. Our argument is that the testimony did not fall within that statute. And since this is a new argument, this is not something that the court should consider or that the state should be required to respond to an oral argument. Say we do find that it was improper. Is this harmless or reversible? It's harmless. And, in fact, that, of course, leads into whether or not this was reviewable despite defendant's waiver. Defendant had forfeited this issue because never objected to this testimony in the trial court, never raised this issue in the post-trial motion. The trial court, as a matter of fact, made only one reference to this testimony and its findings. The court, of course, found that the evidence of defendant's guilt was overwhelming. Any prejudicial impact was reduced where this was a trial before the bench and not the jury. Defendant could not have been prejudiced. Any conceivable error in the admission of the evidence would be harmless. The trial court did consider that and specifically stated that the viewer's testimony, that the matter-of-fact nature in which G.H. had spoken was consistent with continued abuse over a period of time. And that was certainly a factor that the trial court considered. That was a factor, Your Honor. But we would argue this is just a single reference. The court did talk about that. But in order to find that that was reversible error, this court would have to find that despite the overwhelming evidence of the defendant's guilt, despite the fact that the trial court is presumed to be able to make these distinctions and consider the evidence in a proper way, that we're going to ignore the fact that defendant was okay with this testimony in the trial court, yet we're going to reverse because the trial court made that single reference. And that just, we would argue, is not warranted in light of all the circumstances. Well, if that were the case, as you've just set out, is that not ineffective assistance? How's a trial strategy? Well, that this would not be something that, of course, the argument is that this was proper evidence, that the viewer was qualified. Court referred to her as being qualified, and so did defense counsel. Defense counsel, in closing argument, said that Mueller was qualified as an expert, of course, and the trial court referred to her as an expert in the field of forensic interviewing. So she was qualified to give the testimony that she did based on her background and experience. Her testimony didn't fall within the statute. And so defendant's argument would fail on the merits. So it wasn't error. The testimony was entirely proper. And any possible error would be harmless in light of these other circumstances that we discussed. And you're saying procedurally that you're sort of arguing procedural default on the issue of vouching for the credibility. If it had not been defaulted, would that have been error? Or do you feel, based upon this record, that this testimony did, in fact, vouch for this child's credibility? No, Your Honor. This was something where it was expert testimony based on the witness's qualifications and background and experience. And to say that somehow it vouched for the victim's credibility, it's not similar to what the court found in Simpkins. It's not approaching cases that come to that conclusion. And as Your Honor pointed out, the court in Turner found that similar testimony was entirely proper. It's not syndrome testimony. Not syndrome testimony, exactly, Your Honor. What is the difference? I mean, what do you classify as the difference between what we heard in this case and actual syndrome testimony? Where, obviously, if the witness had referred to some kind of syndrome, but also if the witness had said, well, these are the things that the victim, the things that the victim, the behaviors or things that she said, and they fit within some set of behaviors or syndromes or, well, or I think that the case is referred to. Behavior that's consistent with a child who has been sexually abused. Exactly, yes. Behavior was consistent with a known syndrome, behavioral patterns. Wasn't that somewhat testified to here? To the extent that the witness talked about a red flag, possibly, but as far as fitting it into any known syndrome. And, of course, the argument is that this was improper under the statute that says that you have to be qualified to give testimony as to a syndrome. And that's not what this witness did. If we wanted to argue generally about other things, then, you know, there's gray areas. If the interviewer said, I was concerned that she exhibited this tendency because I have seen other children do it, and this was a red flag to me, what's the difference in those two statements? I think it would be, again, a gray area because she's talking about this is what I've seen with other children based on my experience, not that there is some syndrome out there giving it the imprimatur of something that someone else has recognized as showing, yes, this is an abused child. Didn't the Wilder case talk about testimony regarding a highly technical and complex psychological model or theory, and that was syndrome testimony, whereas in that case they didn't find it to be syndrome testimony because it wasn't this highly technical, complex model or theory? You're arguing, I take it, that this is not a, what happened here in the testimony that we heard here from Mueller was not highly technical and based on any complex theories or models? Exactly, Your Honor, exactly. Okay. Unless the court has any further questions, we simply ask that you affirm. Thank you, Counsel. Ms. Weck? Your Honors, in rebuttal for the second argument, the counsel suggested that has been procedurally defaulted, but specifically in my opening brief I talked about how the judge used Mueller's improper opinion about DHS behavioral patterns to bolster DHS testimony that Mack had abused her. That means that what she's doing by testifying about these red flags is bolstering, vouching for DHS credibility. So I would like you to reject the idea that it's been procedurally defaulted in any manner. All right. Specifically then, looking at what you said in your opening brief, what is this witness, what's the purpose then of this witness if it is not to identify for the court through this procedure of forensic interviewing things that are important to whether there has been some sort of criminal activity? I mean, what's the purpose of this testimony? The purpose of hers is to show how she elicited the information out of DH. Okay, how she did it, but then she's not supposed to say what she found out? She could report DH knew the word for female, for male genitalia, but not for female. But for her to say the word red flag, that's suggesting by the fact that she knew this, that's a red flag. But when you look at that, she had a little brother. Maybe that's why she knew the term. Maybe that's how. But still, it wasn't technical, as Judge Burke has indicated. It was red flag is a real common kind of a slang for this got my attention. Well, the way she's using it and then the way the judge uses it, especially about the one about the calm, her DH's calm demeanor. Talk about the calmness. You have a police officer testifying with respect to taking a statement from a witness or a defendant in a murder case, for instance. Doesn't the police officer oftentimes testify about the demeanor of the individual that they're getting the confession from? They do, but they don't necessarily, are they supposed to say that it's more likely they're lying or telling the truth by what the meaning of their demeanor is? Which is what Tracy Mueller is doing in this case. She's giving her opinion of the meaning of DH's demeanor, that this is raising a red flag to her, that this was happening a lot. This was not a one-time type event. She's interpreting it for the court. Well, when she talked about the calmness, she didn't say red flag when she talked about the calmness. I'd have to look. I believe that she did say something about it being a red flag. I think she talked about the red flag when she talked about describing the body part. Well, she did. She used the word twice. She said during the interview that she was very calm, which was, quote, a little bit of a red flag as to that what she was talking about was pretty common for her. It wasn't a one-time scare to death shock thing. So it's kind of like Tracy Mueller is using this term red flag almost as code for when I see these things, I'm thinking this kid actually has been abused. So in an interrogation of a defendant, if the prosecutor says that the woman stabbed her husband to death, for instance, and the prosecutor says to the police officer that her demeanor, did that concern you at all or did that cause you any concern? And the police officer says, well, yikes, she had just done this. I would be concerned at the way she behaved herself. Is there anything improper with that? I don't think that seems proper. It doesn't seem proper for him to be offering his opinion on that. He's not qualified as an expert in this kind of case. But isn't he an expert in forensic questioning as your witness is here or as the state's witness is here? I'm not sure if I can answer that specifically at this point in time. The fact is that she was not presented as an expert in child sex abuse accommodation syndrome. No, but the foundation was laid with respect to her history in interviewing. In interviewing. Then we're crossing over this line. And who she interviewed and how many years she did this interviewing. Isn't that relevant to her forensic interviewing as well as her purpose in being part of this process to provide a calming, non-threatening sort of circumstance for any child, whether abused or not, to come forward and testify or to tell a story? Yes, she's probably had expertise in that area. I'm presuming from what she said about her training. But she didn't say anything about what she knows about child psychology or child sex abuse accommodation syndrome, which syndrome is just the behaviors exhibited. And she's talking about these behaviors are falling under this category. Does any interpretation of a child victim's words or actions by a trained forensic interviewer equal syndrome testimony? If there's any interpretation, which you're talking about, I think you mentioned the word interpretation, so this witness is interpreting that child's actions are being counted as being consistent with being abused. Does any interpretation of a trained forensic examiner, in your mind, amount to syndrome testimony? If it's in this sort of, it probably could be, yeah. Well, then how do you, the court of Turner and some of these other cases where they allow certain things in from certain witnesses who have had experience in these areas and say that it's common for this to take place with a child who's abused? Well, Turner specifically was the police officer, I believe. That would be his experience with his observations of what they do. They initially deny. As would be his witnesses. Well, she's going beyond that with the whole red flag and interpreting it to mean she's been abused. The third thing that she said, which was that they commonly disclose after they've talked to somebody else, that would be more in line with Turner of something that she has observed the way they present it out. It's kind of like an observation of what has been his experience watching them happen. Whereas when you're talking about red flags, knowing the term for the male, not the female genitalia, or the demeanor is certain like this, that means they've been abused. That's kind of different than saying this is what happens when they disclose, they've talked to somebody else. It's like the distinction between an observation, something objective, and then veering into interpretation of it, what it means. If that kind of makes sense. That's how I was differentiating those types of cases. In conclusion, Henry Mack asks this Honorable Court to reverse his convictions and remand for a new trial. Thank you very much. Thank you. This case will be taken under advisement. A disposition will be rendered in due course.